Case No. 18-5334, Department of Medical Assistance Services of the Commonwealth of Virginia, Appellant v. United States Department of Health and Human Services, at Mount. Mr. Appellant, or the Appellant, is going as for the Appellant. Thank you. Thank you. Good morning. May it please the Court. Susanna Vance-Gopalan on behalf of the Commonwealth of Virginia. This case is Virginia's challenge of an HHS disallowance relating to disproportionate share hospital or DISH payments that Virginia made to two state hospitals. DISH payments are unusual in the Medicaid framework in that most state Medicaid expenditures are payments to healthcare providers for specific services that they provide to Medicaid patients. But DISH is different. It's a supplement that states are required to pay in some form or fashion, but using a methodology at their discretion in order to, in the words of the statute, take into account the situation of hospitals that serve a disproportionate number of low-income patients with special needs. In this case, Virginia made the DISH payments, for which federal participation has been disallowed, in compliance with its state plan. The amounts it paid, the timing of the payments, the association of payments with years, all of that was consistent with the state plan and with federal law. And HHS has premised this disallowance, we believe, on essentially three fallacies, three invalid assumptions. And when those are clarified, there's nothing left of the disallowance. And the first one is that Virginia was required to design its DISH payments as reimbursement of costs incurred by hospitals. That is simply, flatly contradicted by the statute. The Social Security Act, Section 1923C3, gives states discretion to design a DISH payment methodology that is, quote, reasonably related to the cost, volume, or proportion of services provided to Medicaid patients or low-income patients. That's a real discretion, and states use it. And Congress intended that discretion to exist. Virginia used it to design a DISH methodology where payments are computed in advance of the year to which they apply, using Medicaid utilization or low-income utilization as the primary factor. So it's a proportion-based DISH payment. It's not intended as reimbursement of costs. The second HHS fallacy on which the disallowance is premised is essentially a pivot HHS has done. CMS is required to state the legal basis of a disallowance in its disallowance letter. And CMS said to Virginia, we don't agree, but they said Virginia had failed to comply with the limit on DISH referred to as the statewide allotment. HHS... Can you pause over the first one? So I understood, although perhaps filtered by your opposing colleague's description, that HHS is not saying it has to be for reimbursement of costs, but it has to be for reimbursement for services in a particular year. And the costs are related to the services, costs incurred for services, just like the language of the statute talks about cost, volume, et cetera, and so forth. And I'm wondering if that's true. So their allegation is not that it's a payment back for costs, which it is for the hospitals, rather than the annual allocation, but rather the year in which the services render. Right. And you know, what we would say to that is, and the legislative history on this provision is actually quite illuminating. Over in 1990, in the conference report, Congress chose specifically, chose this wording, cost, volume, or proportion, in order to give states real flexibility. Which provision are you talking about? You're talking about C? Yes, Section 1923C3. Because before 1990, there were two options enumerated in the statute, and C3 was added in 1990. I mean, you know, our thought, yes, what Virginia's methodology does, certainly, is that dish payments relate to services in that they relate to the proportion of services furnished to Medicaid patients in the year that the payments apply to. So for year one, Virginia has, in advance of year one, used Medicaid utilization data from a prior period. They take the hospital's inpatient operating rate, combine that together, and for year one, they've developed a dish payment that's related to services in the sense that they're related to Medicaid patients. But it's intended to take into account that this hospital serves a lot of Medicaid patients. That's how it's related to services. It's not related to paying hospitals back for costs that they incurred, and that's a critical distinction. No, but I want you to focus for me and explain why the other side's argument. We're still talking about services rendered in a particular year. Not that it's reimbursed for the costs, but that it's related either to the costs or to the volume or to the proportion of services rendered in a particular year. Right. Certainly. I agree with that. And so say, for example, that in the year prior to year one, Virginia had a, you know, UVA hospital had 25 percent of their patients were Medicaid patients. That's a real relationship to services. A quarter of the services they provided were to Medicaid patients. And by the way, that's the way Medicare designed dish for a long time. It was proportion based, not based on payment for costs. So how can it end up paying for more than one fiscal year then? Well, so essentially, and I'm glad you asked about the timing issue, because we think there is great self-contradiction in what HHS is arguing here. What's the answer? Leave aside their self-contradiction. Okay. So your question, I'm sorry, your question is how is it possible to... If it's for services in a particular year, how is it possible that the payments, for example, for FY2004 costs are allocated to FY2006 and 2009 allotments? Right. And the initial premise is false. The payment is not for 2004 costs. Virginia doesn't design its dish as payment for costs. Do the payments relate to services in a particular year? The payments relate to services in that they relate to the intensity of the care furnished to specific, more intensive need and, you know, poorly reimbursed populations, Medicaid and low income patients. But the payments don't, they're not cost reimbursement. Can you leave aside the... Are they in any way related to services in a particular year? The dish payment is, I'm trying not to simply rephrase what I stated before, it's related to services in that it relates to the proportion of services furnished to Medicaid patients. In a particular year. Right. So for year one, Virginia has taken data from prior years, projected it forward to create a dish payment for year one that takes into account the proportion of Medicaid patients that Virginia considers UVA or Virginia Commonwealth University will be likely to treat in that year. The payments are related to the proportion of services that are provided to Medicaid or low income patients. But it's very clear on the face of Virginia's state plan, which as you're familiar with, I'm sure, is the critical document in how states administer their Medicaid programs, that these are not cost based. There's a payment and Virginia can choose whether to allocate it for year one or year two. They have a choice. Virginia, even though we're talking about whether it relates to services rendered in a particular year, it turns out it actually relates, it can relate to services rendered in year one, or it can relate to services rendered in year two, or it can relate to services rendered in year three. It's up to you to decide. That's the way you're looking at it. What I would say is there are three relevant limitations when Virginia pays a dish to a hospital. The first is the state plan methodology, and then the second and third are these sort of backstops, the statewide allotment, which is aggregate, and the hospital specific limit, which is unique to the hospital. And so when a state plan amount for the University of Virginia is established in advance of year one, it's $20 million. Virginia has determined that that's how much they're entitled to on the basis of their intensity of service to Medicaid patients. Then, the regulations count as this, and it's a longstanding practice affirmed by the Department of Appeals Board that Virginia can make a base payment to UVA in year one that represents a portion of that. And then over the ensuing years, Virginia continues to make disbursements that all relate back to year one and to that payment to which UVA was entitled because of the high volume of Medicaid payments. And so, again, it's not just Medicaid patients, but it's served in that prior year. But even if it's patients that were served in that prior year, and you're calling it year one, and let's suppose the statewide cap is exhausted for year one, then what you're saying is, even though it relates to services in year one, and I get that you're doing the reconciliation post hoc, and so you're saying, okay, we still have some stuff that's dribbling out that's related to year one, and we look back at year one and look, uh-oh, we're capped out on year one. So what we're going to do is we're going to take these kind of post hoc dribble out costs, and we're just going to apply them to year four instead, because we still have room under the cap in year four. That's... Right. No, it doesn't work that way. So Virginia's, say, UVA's state plan entitlement for year one is $20 million. Once Virginia has made payments to UVA, which may occur on an incremental basis over a number of years, UVA will never receive any more UVA payments. Virginia essentially stops paying once it has paid up to the statewide allotment or to the hospital-specific cap. So those backstops really do serve to limit what the hospital receives under the state plan methodology. But then what about what the state gets from the federal government? I thought the question is, you're seeking reimbursement, and the way you're saying you're entitled to reimbursement is that you're saying, well, even if we couldn't get reimbursement for year one because we're not going to get it for year two. Because the statewide cap has been exhausted, we still have room under the cap in year four. Yes. No, that's not an accurate statement. There's a state plan amount that is calculated for a hospital in each year, and the Commonwealth pays up to that amount to the extent allowed under the relevant limits. And then the same would occur for year two. It's a prospectively determined amount, and then incrementally, disbursements are made. And frankly, the state plan methodology was designed, really, in order to enable Virginia to make payments to get just as far up to the statewide allotment as is possible, and that is perfectly allowed and countenanced in the federal regulations. For example, which state that, you know, if a state's actual dish expenditure is applicable to a year or less than its final dish allotment for that year, the state is permitted to make additional expenditures up to the amount of its final dish allotment. So it was, you know, the state plan methodology did allow Virginia to make generous payments to these two state hospitals that were disbursed over the course of numerous years. But the original entitlement under the state plan was determined prospectively based on utilization data. And, you know, another fallacy we believe that this, that disallowance is premised on is that somehow this case is about the hospital-specific limit. CMS stated in the disallowance letter that Virginia hadn't complied with the statewide allotment. We believe that they reached that conclusion because they were relying on this faulty premise that the payments had to reimburse costs, which isn't how they were designed. But in defending the disallowance, HHS alluded to this possibility that Virginia might have exceeded a different limitation, the hospital-specific limit. We want to be really clear, CMS did not cite any violation of the hospital-specific limit. They didn't refer to any of the regulations or materials that they would normally consult relating to that limit. And it's not clear or transparent in agency practice to essentially shift the goalpost like that, as has been done. We feel this case is about the statewide allotment. And if I might, I'd like to just address the statutory interpretation issue for a moment. The record is replete with statements where the board, HHS, the district court echoing it, state essentially that dish payments must be associated with the years when hospitals incurred costs that the payments relate to. And it's just this, there's been a deaf ear to the reality of what Virginia's dish payment methodology is about throughout the years. And we feel it fails at Chevron step one, because it's simply against the statute. And HHS is essentially shoehorned into that, this tiny issue. Essentially HHS is saying, oh, we understand that you're allowed to design dish methodologies that aren't based on cost, but when you're associating your payments with years, make sure you associate them with the years that the hospitals incurred the cost that you're reimbursing. It's completely circular and self-contradictory. And once that basic premise is clarified, that the payments aren't reimbursing providers' costs, the whole sort of edifice of the disallowance falls down. It doesn't make any sense. Do you, I'm sorry, I know you've explained this to me before. Do you agree that it has to be in relation to the year in which the services were rendered? Yes, we believe that the dish payment relates to the proportion of services furnished to, right, to Medicaid or low income patients in a particular year. Aren't costs incurred, in other words, incurred that has to do with having provided a service, isn't it? When costs are incurred, they're incurred in connection with providing a service. Certainly they are, but payment methodologies are, there's a big difference between designing a payment as a, making a provider whole for the number of dollars they've lost by serving certain patients. I understand that. Okay, I apologize. I'm just asking, doesn't the incur of costs indicate the year in which the services are rendered? No, I believe the injecting of this cost concept as an essential part of the standard relating to the payment. You think costs are incurred in a different year than the services are rendered? I'm going to have to stop on dish. Maybe I've now said it several times and you're not listening or following. When costs are incurred, they're incurred in connection with a service, correct? Otherwise, the hospital couldn't charge a cost, right? Right. So that means in that particular, at the time in which the costs are incurred, it relates to a particular year. Isn't that right? Regardless of whether you're reimbursed for the costs or not, it's a marker of the year in which the services were provided. Certainly costs are incurred in a particular year. However, the limiting of dish payments to incurred costs is not something that I would recommend. It's a distinct process. It's not part of the payment methodology. So without the last clause, it's correct, though, that costs are incurred in connection with services in a particular year? Certainly that is correct, yes. So to follow up to that, that language, as far as I know, that language is in the hospital-specific provision. I'm not aware of that language being elsewhere, about costs incurred. Right. That's right. Because the hospital-specific provision speaks in terms of whether the payment adjustment exceeds the, quote, costs incurred during the year of furnishing hospital services. Correct. And in all of 1923C3, there is no reference to cost. There is no reference to uninsured individuals. The hospital-specific limit is truly a distinct limitation. It's not meant to transform whatever the state is using as its dish payment methodology into a cost methodology. And we think HHS is... But you do agree that the hospital-specific limit, which does use that exact language, as I'm quoting it... Yes. ...then that provision contemplates that, as far as the hospital-specific cap goes, the costs are incurred in connection with services that are rendered during that particular year. So costs and services relate to the year in which the services are furnished. Right, right. Under the hospital-specific limit, yes. The payment to a hospital during a fiscal year is not to exceed the costs incurred by the hospital during that fiscal year. And the other thing that happens during that fiscal year is that's the fiscal year during which the services are rendered. Right. But these are distinct provisions. In Section 1923F, the statewide... Yeah, I know we're only talking about the hospital-specific part of it. That's your point. And you think that provision's off the map here anyway. Right. But for purposes of the operation of that provision, the costs and the services are all pegged to the year in which the services are furnished. Right. The measure of the limit is costs incurred in a year compared to the payments in that same year. Yes. Ms. Marcus. Thank you, Your Honor. I'm Stephanie Marcus from the Department of Justice, and I represent Applebee's HHS and the Secretary of HHS. Judge Rowland, I think you put our main point to opposing counsel just now, which is regardless of what methodologies... state uses, whether it be cost volume or proportion of services, it's tied to performing services to low-income patients in a particular fiscal year. And the provision they rely on, 1396R4C, is expressly subject to both the statewide allotment and to the hospital-specific limit. And thus, though HHS acknowledges states do have flexibility about their DISH methodology, it nonetheless needs to be tied to services performed in a particular fiscal year. And both subsections F and G, the statewide allotment and the hospital-specific limit, speak in terms of for the fiscal year or during the year of furnishing... So F, the statewide cap part, is not talking about... I'm not saying that it's inconsistent with F, the way you're looking at it, but it doesn't seem compelled by F either, because F just doesn't talk about the furnishing of services. G does. G says the payment adjustment, it speaks in terms of payment adjustment exceeding the cost incurred during the year of furnishing hospital services. And then later on it says, for services provided during the year. So the hospital-specific provision does speak in terms of the furnishing of services during the year. But the statewide cap one, I may be using the wrong terminology, but the statewide cap one, yes, speaks in terms of in a fiscal year and allotment for the state for the fiscal year, but it doesn't talk about services being provided during that year. It doesn't, Your Honor, but a DISH payment is an additional payment for hospitals who perform services for a particular fiscal year. For patients in a particular year. And the whole setup of doing DISH payments is per fiscal year or cost year. And if you look at the... The agency's reading is the better reading of the statute, because you need to take into account all of these subsections. I think on its face, though, the statewide allotment still talks in terms of having a statewide limit for an additional payment. For a fiscal year, and then you look at what the state... But even the way they're looking at it, it still has a statewide cap for a fiscal year. It's just, your point is, it's not pegged to services being furnished during that year. Their response would be, it doesn't have to be under G, because G doesn't talk about the year in which services are furnished. G's just agnostic about that. I'm sorry, F. F is agnostic about when services are provided, at least arguably, textually. G may not be, but F is agnostic about the year in which services are provided. But since they have to comply with G, indisputably, they need to have some kind of accounting system that would not allow them to circumvent G. It's true that, and we're, the agency wasn't trying to hide a real concern or anything. They did violate the statewide allotment, and we believe the statute's clear, but we also would refer to the agency regulations that the district court relied on. When you say we believe the statute is clear, are you talking about F, or are you talking about G? The statute as a whole. The statute as a whole, because F, suppose G just didn't exist. If you just had F, and they would still have the same program in effect where they say, we're still under the cap for, say, 2006, even though we're talking about services that were rendered in 2004, we're just going to apply to 2006, and we're still under the cap for 2006. And then I think their argument would be, well, you look at F. F doesn't speak clearly on that. You need G, because G is the one that pegs to the year in which services are provided. No, Your Honor. We would disagree with that, because F does talk about payments to a State for dish adjustments made for quarters in a fiscal year in excess of the dish allotment for the State for the fiscal year. It's talking about one fiscal year. And I would refer the Court to page, Joint Appendix page 150, which is the attachment and response of Virginia to when CMS was questioning, you know, what they were doing in the years at issue here, 2010 and 2011. And the Director of Provider Reimbursement at the Department of Medical Assistance Services wrote a letter explaining what Virginia was doing and included an attachment. And, for example, on page 150 of the Joint Appendix, it's Administrative Record 292, paragraph 3 explains that MCV Hospital has an enhanced dish payment for fiscal year 2008. This is an enhanced dish payment that the Department wants to make to cover, first of all, it says to cover State-defined indigent care costs. And I do think there is some confusion in what Virginia is arguing about their regular dish payments and enhanced dish payments. What's at issue here isn't their regular methodology for doing their prospective payments. These are these enhanced payments that are only to two State-owned hospitals. And they are done, as you can see here, they were done much later. And it says these costs were accrued to 06, 07, 08 and 09. So that we think on its face violates a statewide allotment, which is talking about one year. And I don't, whatever States have flexibility to do, it's not this. I don't think Congress would have written the statute this way. I mean, we have G if you need it, but I think even looking at F, the way the language is phrased, it doesn't contemplate a State just going back and saying, well, I think we have some room here and some room there. They could just keep doing this on in perpetuity each year. Subject to the cap each year. Subject to the cap in retrospect each year, but if there's something, I mean, we think that this is the only way to comply with the regulations here. The agency has regulations implementing the statewide allotment. And it's 42 CFR 4447.297 D3 and D2. And in D3 it says if the State's actual DISH expenditures applicable to a federal fiscal year or less than its final State allotment for that federal fiscal year, it may to the extent allowed by its plan make additional expenditures applicable to that federal fiscal year and our interpretation, which if you do not think it's reflected by the clear language of the statutes, certainly is entitled to deference, is applicable to the federal fiscal year has to mean when the services were performed. And where's that interpretation spelled out? The interpretation is applicable to the federal fiscal year up to the amount of its final DISH allotment for that federal fiscal year. And it's spelled out in both the, not just the disallowance letter, but the departmental medical board's decision. Because in the medical board decision, there's a lot of, there's three prongs to the medical board decision. The first one we haven't talked about this morning. Right. And that's an independent ground that you could affirm. Right. So let's just, let's leave that aside as a potential independent ground. But the bulk of the analysis in the medical board decision is about this independent ground. It's about whether what Virginia wants to do is consistent with what Virginia's been doing. Yes. Right. Right. So then we get to the parts that intersect with federal law. Right. And that's kind of the back quarter, maybe, of the analysis. And on that, there's two prongs, one of which is entitled B, which starts on JA 40 and goes to 43. And it says the disallowance is consistent with DSH statutes and regulations. And it's just a little bit odd for an agency to say we have an interpretation that we think is the best one, and it's the one to which you should defer when all the agency is saying is the disallowance is consistent with the regulations. It's not saying that this is the way we read the regulation and the regulation is best read to support the disallowance. It's saying there's a disallowance because the state breached its own way of doing things, and that disallowance isn't inconsistent with the regulation. That's how I read it. It actually the board actually said that that we therefore agree with CMS that for purposes of determining whether DSH payments are within limitations. I'm sorry. This is on JA 41. It's just the next page. Yeah. Are necessarily allocated to the time periods in which DSH eligible costs were incurred by the hospitals in providing certain services. And so this maybe the subheading throws it off a little bit. They're actually the board in, you know, there was a full briefing. This was a formal adjudication that wrote a very thorough opinion. And as set forth in our brief, we also think it could be affirmed on the alternative ground that Virginia made representations about what was required by its plan, and that they're violating that as well. But, Your Honor, the board did adopt, set forth CMS's interpretation. And on that part where it says, and that's a good sentence that closes at the top of page 41, what's wrong with DSH payments are necessarily allocated to the time periods in which DSH eligible costs were incurred by the hospitals in providing certain services. And that's relating to something that the board had said in a prior determination. And I'm sorry, Your Honor, off the top of my head it says Virginia exhibit one. So we could look that up. It would be in the record. So I'm not sure right now what that is. But we think that, and CMS also in its disallowance letter, which the board was considering, and here saying we agree, that it's saying in the allowance letter itself that, oh, you know what? That's what this is. I apologize, Your Honor. Basically they are adopting what is in the CMS disallowance letter, and where CMS said where the state DSH allotment for a year has not been exhausted. The regulation provides that a state may make additional expenditures applicable to that fiscal year up to the DSH allotment for that fiscal year. It doesn't allow the state to make additional DSH expenditures. And it does. And then right after that it says the DSH statute and regulations do not allow DSH payments to be disconnected from the periods in which the hospitals incurred DSH eligible costs in providing certain services. So we agree that it's when the services were provided that's the key, but that is what gives rise to the costs, which, you know, ultimately is a reason that Congress wanted to provide for DSH. But what we'd be deferring to is the board decision, and what you're saying is that the board decision incorporates the CMS interpretation, and that has the interpretation. It says it agrees with it, it quotes it, and then it refers to the exhibit, and then the letter itself goes on more at length. And basically the board is saying we agree with this explanation. One more question along this line, and then I'll stop. So on the hospital-specific portion of this, as far as I can tell from the board's decision, that only comes into play in the last two pages. Is that right? That's where the board makes the point that if we were to allow what Virginia wants to do, then it would enable a circumvention of both the statewide allotment and the hospital-specific cap. But elsewhere, the hospital-specific cap isn't part of the rationale of the adjudication to which you want us to attach. Wait, you're saying the hospital-specific part comes into play just in this last paragraph? I'm not saying that means that it doesn't come into play. I'm just saying that there's nowhere else that you would point us to look. I don't think so, Your Honor. I think that it would, but we do think that is a full explanation of why they could avoid that limitation. Because if you're not tracking, if you see, oh, if there's no connection to when the services were performed, then they could allocate that money to a year in which the hospital didn't perform as many services, and say, oh, well, it didn't reach its hospital-specific limit in that year. But for the year in which it actually had, and again, on page one, if you see the way that they actually allocated the payments, that becomes clear, because by using in one fiscal year and allocating to a number of different years, and they also said that the standard process is to accrue the payments the oldest year that there's hospital-specific dish limit and statewide dish allotment, but that if the services were performed in a different year, it may end up, you know, the dish, the hospital-specific limit could be circumvented for that other year. So we ask that the Court approve. The way we've all been talking about it is as if, the way it's been discussed with you, is as if it's retrospectively applied to a year in which the services were rendered. I understand that HHS has said in other places that it can be done prospectively. So how do those two relate to each other? Well, Your Honor, and this does relate, Virginia's plan is mostly a prospective plan, as they've stated, and these are the regular payments, and HHS sets forth the statewide allotment by April 1st of the fiscal year. But as Virginia itself explained in its briefing in the prior appeal, that just because of the way the system works, there are different, you know, numbers that are coming in and out, and they do need, even if you have a prospective system, they acknowledge they needed this settlement or verification process, and they also acknowledged, and again referring to pages 150 and 151 of the joint appendix, that they are going back in 2010 and 2011, and these are just for these enhanced payments just to the two state-owned hospitals. This isn't talking about the regular payments under the rest of their plan. So in your view, in what way is a prospective plan allowed? Well, it would still be subject to the, it's allowed so long as they have a system in place, so long as states have a system in place where they can make sure for that year that neither the statewide total... Can they not project services in the next year based on services in the previous year, and make the payments with respect to projected services? So you have a certain volume, a certain amount, whatever the method is, last year, and we as the state are going to project into the next year that it's going to be the same or it's going to be different, assumed for some reasonable, rational reason. Can the allotment not be sent to those state hospitals, including the enhanced payments based on the projection? My understanding was the enhanced ones were done later. That's the way that you're saying Virginia does it. I'm asking you whether some other state could do it some other way based solely on projections. Your Honor, as long as they comply with the federal limits, and as long as they have a methodology that complies with C, as we said here, the court doesn't need to figure out what methodologies would satisfy this. What we're saying here is Virginia does not, and that's what the Board decided here, and it's hard to think of all the possible ways the state could do it. So conceptually, suppose the state says at the beginning of the year, we project our costs to be $10 million, and the statewide cap is short of the statewide cap for that year. And then if it turns out that, how do you determine, for example, whether the hospital-specific cap then is exceeded? So if you're looking forward, but then the way you understand the hospital-specific cap, it turns on the services that are in fact rendered in a particular year, but you don't know yet what the services are going to be for that year because it's a forward-looking projection. That's right, Your Honor, and actually that's what we have quoted Virginia's briefs saying. That's why they had to look when they were making. Now some of these, I think some of the regular payments are, they don't have a, they just know from projections or what's happening in real time that it's not exceeding the limits, but these enhanced payments, they have a very large multiplier of the regular payments, which are more, which they have, the state has acknowledged it's never paid up to that amount, but the state plan would authorize 16 or 17 times the regular payments. So for this particular setup of payments, for those payments, there's a real chance that those payments could and do exceed the limits. So for those they do, and I'm. And then if they do exceed the limits, then the federal government won't reimburse. Right, and so it means that in theory they can use a project forward method, but in fact. And they can use perspective, yes. They can use perspective like an estimate, a perspective estimate, but in fact what turns out happening is you can't rely on that perspective estimate because it has to actually comply with the costs that in fact are incurred for services rendered during that year. So basically the allowance to use a perspective method is at the state's own risk because it can use that as an estimate, but then if it turns out that it's making payments that turn out to exceed the hospital specific caps, then the federal government is not going to reimburse. But then that's why it may do a system where it has a combination, where it's sure about a certain, you know, like baseline of payments. But I don't think there's any need to speculate about, you know, possible payment methods that a state could use because the one we have before us now does violate the statewide allotment and does apply payments that are associated with services performed in a fiscal year to four or five different state allotments, and that violates the statute, and we ask that you affirm the agency's decision. Thank you. Your Honors, I wanted to clarify a couple of items, and then I would like to address this prospective issue, which we feel is critical. First of all, the Departmental Appeals Board itself has acknowledged that its decision is not a formal adjudication when it is reviewing a Medicaid disallowance because the provision of the APA defining a formal adjudication, you know, calls for there to be a hearing on the record, and the DAB has acknowledged it's not a DAB. Medicaid disallowance decision is not that. So to the extent that influences whether CMS interpretation is, you know, has the level of congressional delegation that would entitle it to Chevron deference. Haven't we given it that credit in other cases? I'm sorry? Haven't we given it that deference in other cases? I know you have given Chevron deference in, for example, in Gentiva, which I believe involved review of a Medicare Appeals Council decision, but there that's more of an ALJ decision where there is a hearing on the record. Then the pharma case that was cited, that relates to review of state plan material, which is a different standard as well. So I couldn't find any D.C. Circuit case where you had held that Chevron deference is due to a DAB decision reviewing a Medicaid disallowance, for what that's worth. I also wanted to note with respect to the comments of Mr. Lessard that my colleague mentioned, Mr. Lessard took care to mention that Virginia had chosen to make disbursements of enhanced dish taking into account certain indigent care criteria that are part of state policy. But he also took care to say the documentation supports state indigent care policy and is therefore not relevant to determining compliance with the state plan. Virginia set its dish payment to hospitals prospectively in advance of the year. Once the hospitals had that entitlement, Virginia made base payments and then it disbursed them incrementally over time. And the motivation of Virginia for making any given payment of dish to which the hospital is entitled under the methodology, it's not relevant under the state plan. And we do feel the HHS decision here, it just completely ignores this language in the state plan, which I would like to commend you to read. It's joint appendage, page 64. The payments shall be prospectively determined in advance of the state fiscal year to which they apply. They're final, not subject to settlement, except when necessary due to the relevant federal limits. It's only when you get to the hospital specific limit that the concept of cost enters this equation at all. And CMS has been very clear, for example, in its 2008 rulemaking, which CMS for the first time, 15 years after the enactment of the hospital specific limit, they implemented an audit protocol for states to determine if payments exceeded the hospital specific limit. And CMS explicitly said, we recognize states have discretion in their methodologies. We're not meaning to constrain that. This audit mechanism serves as a separate guardrail, where after the fact, look what Judge Srinivasan, you're correct. You can make these payments prospectively under any manner of methodology. And as long as there's a separate guardrail in place with this audit, then ultimately the payments aren't going to be made that exceed FFP. And CMS acknowledged that. So we feel that they are conflating this limit with the payment methodology in a way that very much doesn't give respect to the language of the state plan, which is so key in the federal-state partnership that represents Medicaid. And we would respectfully request that you reverse the decision of the district parties. What about the representations made in the 2002 filing with DHS? Right. So you may be, in 2002, the Department of Appeals Board ruled essentially countenance this methodology. The statement, Joint Appendix 162, using the accrual method, these payments are matched to the state DSH dish allotment applicable to the year in which the services were performed. Right, right. So we would say basically Virginia there was describing the method that it uses to make sure that the dish paid out does not exceed the relevant federal limitations. And we would note that these declarations and briefs were written and filed, you know, 17 years ago. And in the intervening time, a whole structure of regulations was promulgated that directed states how to enforce and monitor their hospital-specific limit. So a lot of the specific statements here about how Virginia kept track of its compliance with the hospital-specific limit are somewhat, are rendered somewhat obsolete by the intervening time. So this method that was used in that year changed somehow between 2002 and now, or the year in which we're talking about now? Well, the declarant says, I mean, I think Mr. Fields, the declarant, is basically stating that when Virginia makes a payment of this enhanced dish, it verifies that the payment will not exceed either of the relevant limitations before it makes the payment. And yet, if you look at the new regulations, I'm sorry. I'm hung up on the words applicable to the year in which the services were performed. Right. So the dish regulations, which were promulgated in 2008, state that for purposes of these audits, you know, the state has to report dish payments in a year and compare it with costs incurred in that year. It's not necessarily a retrospective exercise. And this process described by Mr. Fields, where the state would ascertain when it makes the payment that it didn't exceed the hospital-specific cap, that's no longer really relevant in the same way since this new regulation has been promulgated. Further questions? We'll take the matter under submission. Thanks very much. Thank you very much.
judges: Garland, Srinivasan, Wilkins